IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL LENO VITELLO,           §
(TDCJ-CID #1175602)             §
        Plaintiff,              §
                                §
vs.                             §     CIVIL ACTION H-04-3251
                                §
DALE CRAWFORD, *et al.*,        §
                                §
        Defendants.             §

## MEMORANDUM AND OPINION

Michael Leno Vitello, an inmate of the Texas Department of Criminal Justice - Correctional Institutions Division, sued in August 2004, alleging that law enforcement officers used excessive force against him in 2002. Vitello, proceeding *pro se* and *in forma pauperis*, sues Officer Dale S. Crawford, an employee of the Houston Police Department and Sergeant Oscar Enriquez, a former employee of the Texas Department of Public Safety ("DPS").

After Vitello filed a more definite statement describing his claims, (Docket Entry No. 14),[1] this court ordered service on Officer Crawford and Officer Enriquez. (Docket Entry No. 18). Officer Crawford answered and filed a partial motion for summary judgment. (Docket Entry No. 35). The City of Houston had also filed a motion for summary judgment. (Docket Entry No. 34).

On September 18, 2007, the court granted, in part, and denied, in part, Officer Crawford's partial motion for summary judgment. (Docket Entry No. 39). This court denied the City of Houston's motion without prejudice. This court retained Vitello's claims against Officer Crawford

---

[1]Vitello filed a pleading entitled More Definite Statement, (Docket Entry No. 4), which this court construes as a supplement to his complaint.

O:\RAO\VDG\2004\04-3251.j02

and Sergeant Enriquez for further proceedings.  Vitello's state law claim of assault was RETAINED for further proceedings. On July 31, 2008, Officer Enriquez filed this motion for summary judgment. (Docket Entry No. 54).

Vitello objected to the motion for summary judgment on the ground that he was unable to review the cassette tape and videotape that were submitted as summary judgment evidence. (Docket Entry No. 56).[2] Vitello argued that he must be allowed to review all exhibits before he could file a response to Sergeant Enriquez's motion for summary judgment.

Sergeant Enriquez argued that Vitello had seen the videotape and cassette tape because this evidence was presented at Vitello's criminal trial.   Counsel for Sergeant Enriquez made arrangements, through the Warden's office, for Vitello to review the tapes.  Counsel was advised that Vitello was able to do so on August 22, 2008.

Vitello further stated that counsel for Sergeant Enriquez assured Vitello that he would have a chance to review and correct his deposition testimony.  Vitello complained that he was denied an opportunity to correct and explain his answers from the deposition taken on June 17, 2008.  Vitello argued that he misunderstood pertinent questions.

Sergeant Enriquez stated that on July 2, 2008, Integrity Legal Support Systems mailed Vitello's deposition to Vitello. (Docket Entry No. 58, Exh. A).  The cover letter accompanying the deposition instructed Vitello on the method for altering his deposition. (*Id.*). Integrity records show that the deposition was delivered to the prison unit in Rosharon on July 3, 2008. (Docket Entry No. 58, Exh. B, p. 1).  The prison mail log record shows that the deposition was delivered to Vitello, and that  Vitello acknowledged receipt by signing for it. (*Id.* at 3).  Martha Bentancur, the mail room

---

[2]It appears that Docket Entry Number 57 is a copy of Docket Entry Number 56.

supervisor, provided an affidavit in which she authenticated the attached mail log. She confirmed that inmates are required to personally sign for all legal mail and that Vitello received legal mail from Integrity Legal Support Solutions on July 10, 2008. (*Id.* at 2). Sergeant Enriquez argues that Vitello received his deposition and had an opportunity to correct his deposition. Counsel for Sergeant Enriquez mailed Vitello another copy of his deposition on August 21, 2008. (Docket Entry No. 58, Exh. C, p. 1).

On December 8, 2008, this court ordered Vitello to file a response to Sergeant Enriquez's motion for summary judgment within twenty days of that order. (Docket Entry No. 61). To date, Vitello has not complied.

Based on the pleadings, the motions for summary judgment, the record, and the applicable law, this court grants Sergeant Enriquez's motion for summary judgment. The reasons for these rulings are stated in detail below.

## I.      Vitello's Allegations

Vitello explains that on September 12, 2002, he and his co-defendant, Daniel Polk, planned to sell Officer Crawford drugs in a mall parking lot. Vitello sat in the back seat of Officer Crawford's vehicle and pretended to have drugs in a backpack. Vitello states that he had no gun and was otherwise unarmed. Polk was in the front passenger seat, and Officer Crawford was in the driver's seat. When Officer Crawford turned to see the drugs, Polk pulled a gun on Officer Crawford.

Vitello states that Officer Crawford:

> wore a wire and let the back up lawmen know it was a "jack play" robbery going down. When the other police moved in Polk throw (sic) his weapon down in the car - got the money and jumped out the car and ran. Plaintiff showed no resistance, held up both hands in the air, and said: 'Whatever man you got me'. Crawford picked-up Polk's

> gun, turned to Plaintiff and said: 'Whatever- you are dead' and shot
> the Plaintiff in the mouth.

(Docket Entry No. 4, Complaint, p. 2).

Vitello states that he was in pain and "rendered inert," face-down in the back seat.  Vitello

states he was on the floor of the car and crying out.  Officer Crawford got out of the car.  When

Officer Enriquez approached, Officer Crawford told him that he had already shot Vitello, but that

he was not sure if Vitello was dead.  Officer Enriquez shot Vitello in the back three more times.

Vitello claims the officers pulled him out of the car, handcuffed him, and placed him in the back of

Officer Crawford's vehicle.  Vitello claims that Officer Crawford said, "hurry up and die."  Vitello

lost consciousness and awoke in the hospital.  Vitello claims that he had reconstructive surgery on

his chin, used a colostomy bag, and lost a kidney.

On June 9, 2003, Vitello was convicted of aggravated robbery and sentenced to ninety-nine

years in prison.  Vitello raises claims of assault, excessive force, wanton infliction of pain, and cruel

and unusual punishment under the Eighth Amendment.

Vitello seeks $500,000.00 in compensatory damages; $600,000.00 in punitive damages; and

attorneys' fees.

## II.      Sergeant Enriquez's Motion for Summary Judgment

### A.      The Legal Standard

Summary judgment is proper under Rule 56, Federal Rules of Civil Procedure, "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.* at 322-24; Rule 56(e); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmoving party "cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

Courts must consider the record as a whole, considering all pleadings, depositions, affidavits, and admissions on file in the light most favorable to the non-movant. *Caboni v. General Motors Corp.*, 278 F.2d 448, 451 (5th Cir. 2002).

The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact and informing the court of the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which support its contention. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988). Any controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

If the moving party makes the required showing, then the burden shifts to the non-movant to show that a genuine issue of material fact remains for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). The non-movant cannot merely rest on the allegations of the pleadings, but must establish that there are material controverted facts in order to preclude summary judgment. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Summary judgment is proper

if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof. *Celotex*, 477 U.S. at 322-23; *Conti Commodity Servs., Inc. v. Ragan*, 63 F.3d 438, 441 (5th Cir. 1995).

### B.     Sergeant Enriquez's Summary Judgment Evidence

Defendant Enriquez submits the following summary judgment evidence:

(A)     Affidavit of Officer Crawford;

(B)     Affidavit of Sergeant Enriquez;

(C)     Audio recording of the use-of-force incident on September 12, 2002;

(D)     Affidavit of Commander Kent Radney;

(E)     Excerpts of Vitello's deposition on June 17, 2008; and

(F)     A photograph of Crawford's vehicle soon after the shooting on September 12, 2002.

Dale S. Crawford testified that he was assigned to the Narcotics Division of the Houston Police Department. He explained that approximately 6 weeks before the shooting on September 12, 2002, he met a Hispanic male who went by the name of "Baby D" during a Club Drug Investigation. This suspect told Crawford that he could supply Ecstasy and cocaine. Regarding events on September 12, 2002, Officer Crawford testified as follows:

> A buy bust operation was set up for around 7pm and was later moved to 8pm. I was working with another Squad that is also a TNET Squad. We briefed prior to the operation and I was wearing a body transmitter and provided the undercover work for this operation. Officer D. Nelius and a DPS trooper were monitoring the wire. It was my understanding that the incident would be recorded. I had a total of $8,000 cash for flash money and was covered by Squad 3 of the Narcotics Division as well as some Narcotics Officers who work for the Texas Department of Public Safety. I made phone contact with the suspect and he told me to meet him at Almeda Mall and we agreed to meet at the Foley's parking lot. I arrived in the parking lot around

8:30pm after the cover team was in position. I was driving a 2002 silver Jeep Liberty. I thought I recognized the suspect, "Baby D", in a car as it drove past me. The car was a light blue Chrysler. I made phone contact with the suspect again and he asked me where I was parked and I hit my brake lights so that he could find me. I recognized "Baby D" as he walked up to my car. The suspect got into the passenger side of my car. I showed him $2,000 of the flash money and told him the rest was in the back. As I was counting out the money, he checked out my identification and then patted me down for a wire. He missed the body transmitter I was wearing. The suspect then called someone on his cell phone and told the other party that I was "okay." Then the suspect wanted me to move my car and directed me towards a dump truck that was parked in the parking lot. This was okay with me because I knew where the raid team was parked and I tried to park in a manner that was good for them. Once we parked, the suspect got out of my car and looked around to see who was in the parking lot. Then the suspect got back into my car in the front passenger seat and told me that his buddy was coming and that his buddy had the dope. Another Hispanic male walked up from behind my vehicle and got into the car, in the backseat behind me. The second male had a backpack that he was carrying and when he got in the back seat he began to open the backpack up. "Baby D" told me that everything was cool and the stuff (drugs) was in the backpack. At that point, "Baby D" pulled out a pistol and pointed it at me and asked me where the rest of the money was. I gave the rip signal (the signal to let the raid team know that the situation was going bad) and I told him it was in the back of my car. I told him he could take all of the money. The suspect in the back seat was digging around for the money. There was a lot of yelling from both suspects. The suspect in the back seat reached over me and pulled out the keys to my car."Baby D" was half in and half out of the car and was still pointing the gun at me. Then he told the suspect in the back seat to "Cap me," which is street slang for shoot me. I just knew that the guy in the back seat was going to shoot me in the head. I asked them several times not to "cap me." "Baby D" had the passenger door open to the car and he had the money and was still pointing the gun at me. "Baby D" was half in and half out of the car and was still pointing the gun at me and then must have seen the raid team coming because he looked back into the parking lot and then reached back in and dropped his gun on the front passenger seat. My survival instincts took over and I grabbed the gun and pointed it in the direction of the suspect in the back seat and started pulling the trigger. I think I had to pull the trigger three times before it finally went off. I don't know how many times the gun

fired. Right after the gun went off, it seemed like the windows to the car exploded. I dropped the gun and rolled out of the car. I didn't see any of the raid team members shoot or what happened after I hit the ground. I remember Sgt. Klinger coming over and asking me if I was okay. Ambulances were called for the suspects and I went over and got into one of the unmarked vehicles and waited. I had my undercover weapon, a Baby Glock 40 cal semi auto, in my back waistband. I was unable to get to my weapon during this incident and did not fire my gun. The only gun I fired was the suspect's chrome revolver.

(Docket Entry No. 54, Defendant Enriquez's Motion for Summary Judgment, Ex. A, pp. 1-3).

Oscar Enriquez explained that on September 12, 2002, he was employed by DPS as a sergeant in the Narcotics Division.  One of his duties as a DPS narcotics officer was to assist other police agencies and task forces in "buy/bust" operations.  On September 12, 2002, he was contacted by an officer with the Houston Police Department (HPD) who requested assistance in a narcotics investigation that was to take place later that day.  Sergeant Enriquez contacted additional DPS narcotics officers to assist with the operation. He testified as follows:

On the evening of September 12th, I had met with other DPS and HPD officers for the initial briefing on the buy/bust operation. Later, all of the officers involved traveled to the Almeda Mall parking lot to set up surveillance near Foley's. The undercover "buy" officer, Dale Crawford, was equipped with a listening device, or "wire", that was being monitored by HPD officer Dennis Nelius.  Nelius was to relay the status of the operation and important information over the police radio to other officers in the parking lot. When Crawford gave the signal to indicate he had seen the dope, Officer Nelius would notify us to move in to arrest the suspects. I was parked in the parking lot in a position where I was able to see Crawford's vehicle. Based on the briefing that took place earlier, it was my understanding that Crawford was only supposed to be meeting with one suspect. While waiting in the parking lot, I observed the first suspect show up on foot and get into the front passenger seat of Crawford's vehicle. I now know this person to be Daniel Polk. I then observed Crawford drive his vehicle around the parking lot and eventually re-park near his original location. I was still able to see Crawford's vehicle. Shortly

thereafter, I observed a second suspect on foot approach Crawford's vehicle carrying a backpack. The second suspect, whom I now know to be Michael Vitello, entered Crawford's vehicle from the rear door on the driver's side. This concerned me because we were told in the briefing that there would only be one suspect involved in the operation. Based on my training and experience, I knew that having an additional suspect in the vehicle positioned behind Crawford posed a greater risk to the safety of the officer. Shortly after Vitello entered Crawford's vehicle, Officer Nelius, who was monitoring the listening device, advised us that the suspects were attempting to rob the undercover officer. Fearing for the officer's life, I immediately drove my vehicle toward Crawford's vehicle and parked in front of and facing Crawford's vehicle. As I drove toward Crawford's vehicle, I could see Polk standing inside the open passenger door, leaning into Crawford's vehicle and pointing a handgun toward Officer Crawford. I exited my vehicle and moved quickly toward the passenger side of Crawford's vehicle, where Polk was standing. As I moved closer to Polk, I noticed he had a gun in his hand and it appeared to be pointed in the direction of Crawford. I identified myself as "POLICE" to Polk and told him to drop the gun. Polk looked at me and ran away from me, toward the back of Crawford's vehicle. I then heard a gunshot and saw Polk go down from my peripheral vision. Polk was shot by a nearby officer. Immediately afterward, I heard a gunshot and saw a muzzle blast from inside Crawford's vehicle, heard a yell, and saw Officer Crawford slump to his left. I immediately believed that the suspect in the backseat, Vitello, had shot Crawford. Fearing for the lives of all officers in the area, including Crawford and myself, I fired a shot through the front passenger window toward the backseat area. Although I could not see clearly into Crawford's vehicle due to the dark window tinting, I could see the silhouette of a person in the backseat. I immediately took a few steps toward the rear door in an attempt to direct Vitello's focus onto me and off of Crawford and fired three shots through the rear passenger window, into the backseat. I then stopped firing to see if Vitello was still moving. I saw no more movement and approached the vehicle to confirm that Vitello was no longer a threat. I then saw that Vitello had been hit. Vitello was removed from the car and EMS was called to the scene. Attached as Exhibit F is a true and correct copy of a photograph taken of Crawford's vehicle after the shooting. The photograph accurately shows the vehicle still parked in the mall parking lot as it appeared after the shooting that occurred on September 12, 2002. The photograph shows the front and back passenger windows have been shot out, which was caused when I shot into Crawford's vehicle

toward the person who was seated in the backseat of the vehicle.
When I fired at Vitello, I was in immediate fear for Crawford's life
and the lives of other officer's and citizens in the area. Based on the
totality of the circumstances, the shooting of Vitello by me was
justified and reasonable under the circumstances. It is my opinion that
a reasonable and prudent police officer, under the same or similar
circumstances could have taken the same action that I did in shooting
Vitello. My conduct was in compliance with training and policies of
DPS and did not violate any laws of the State of Texas. Additionally,
my action of shooting Vitello was within the scope of my authority,
was a discretionary act, and was done in good faith.

(Docket Entry No. 54, Defendant Enriquez's Motion for Summary Judgment, Ex. B, pp. 2-4).

Kent Radney is the Captain of the Internal Affairs Unit for the Texas Department of Public

Safety. In his career with the DPS, he has studied and attended numerous seminars on a variety of

issues, including policies and procedures, use of force, use of deadly force, probable cause, officer

safety, police supervision, law enforcement training, internal affairs investigations, narcotic's

undercover operations and officer safety. He has also instructed classes in the areas of police officer

involved shootings, policies and procedures, defensive tactics, officer safety, arrest procedures, use

of force, use of deadly force, undercover narcotic's operations, internal affairs investigations, law

enforcement policies and procedures, firearms, police supervision, first aid and many other law

enforcement subjects. His opinions in this Affidavit were based on his experience, training, and

review of the following documents: investigation of the September 12, 2002 shooting, trial testimony

and affidavits of Michael Vitello, Officers Enriquez and Crawford, and the June 17, 2008 deposition

testimony of Michael Vitello. He testified that:

During high risk undercover narcotics operations, the first priority
of the surveillance or arrest team officers is the safety of the
undercover police officer(s). Narcotics traffickers are known to "rip-
off" other narcotics traffickers by forcefully taking possession of the
drugs or money, with no intention of actually exchanging one

commodity for another. These "rip-offs" can lead to the exchange of gunfire resulting in injury or death to the participants. Narcotics traffickers planning to commit a "rip-off" will often arrive with additional associates that were not part of the original negotiations or hide them in close proximity to the "rip-off" location from where they can launch a surprise assault.

12. Prior to beginning the undercover operation, Enriquez was briefed on the details of the operation and provided a code or signal that would indicate a "rip-off" was occurring. Enriquez was also advised that the undercover drug deal would involve the undercover officer and one suspect. During the undercover operation, Enriquez was advised that it was a "rip-off." Knowing the inherent danger in a "rip-off" situation, Enriquez's actions were reasonable when he approached the undercover vehicle. Enriquez reasonably believed that a "rip-off" was occurring and reasonably believed that the life of officer Crawford was in immediate danger.  Observing Polk holding a weapon aimed toward Crawford and observing an additional unknown suspect in the back seat of Crawford's vehicle, the actions of Enriquez in using deadly force were reasonable. Because Enriquez had been told that it was a rip, it was reasonable for him to conclude that the suspects had weapons. In addition, when Sgt. Enriquez witnessed a muzzle blast inside Crawford's car and saw Crawford fall to the side, it was reasonable for him to conclude that Crawford had been shot and reasonable to conclude that Vitello had a weapon and that Vitello posed an immediate threat to Crawford and other officers in the area.  Based on all of the circumstances observed by Sgt. Enriquez, and the training he has received regarding undercover operations, it was reasonable for him to fire four shots at Vitello. DPS officers are trained that they are permitted to use deadly force when they believe the life of another is threatened. DPS officers are also trained that when deadly force is justified, they are to shoot until the threat is stopped.  Once Enriquez believed that Vitello no longer posed a threat to others, he ceased shooting.  The actions of Enriquez were consistent with his training he received at the DPS. Sgt. Enriquez placed himself in danger by his attempt to rescue an officer who was being robbed at gunpoint.

13. It is my professional opinion that a reasonable and well-trained law enforcement officer, when presented with the same or similar circumstances, could have taken the  same or similar actions that officer Enriquez took on September 12, 2002, in connection with shooting Michael Vitello. Officer Enriquez' actions were within the course and scope of his law enforcement authority, discretionary, objectively reasonable, and conducted in good faith.  There is no

objective evidence to indicate that officer Enriquez violated Vitello's
constitutional rights, or the laws of the State of Texas, or DPS policy
or committed an act of assault against Vitello, when Sgt. Enriquez
while attempting to rescue Crawford shot Vitello four times.

14. It is my expert opinion that officer Enriquez' use of Deadly
Force was within the course and scope of his law enforcement
authority pursuant to the Texas Penal Code § 9.32. Deadly Force in
Defense of Person and Texas Penal Code § 9.51.

(Docket Entry No. 54, Defendant Enriquez's Motion for Summary Judgment, Ex. D, pp. 4-5).

Sergeant Enriquez asserts his entitlement to qualified immunity on the grounds that Vitello

has failed to allege a constitutional violation and that Sergeant Enriquez's actions were objectively

reasonable in light of clearly established law.  (Docket Entry No. 54, Defendant Enriquez's Motion

for Summary Judgment, pp. 5, 13-19). This court analyzes Sergeant Enriquez's motion and the

summary judgment evidence under the applicable law.

## III.    Analysis

Qualified immunity shields police officers who reasonably, but mistakenly, violate a

plaintiff's constitutional rights. *E.g., Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007).  In other

words, they are entitled to "immunity if a reasonable person in their position 'would have believed

that [their] conduct conformed to the constitutional standard in light of the information available to

[them] and the clearly established law.'" *Id.* (alteration in original) (citation omitted).  "Qualified

immunity 'provides ample protection to all but the plainly incompetent or those who knowingly

violate the law.'" *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005)

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When asserting qualified immunity in a summary-judgment motion, movant meets his burden

by pleading in good faith that he is entitled to such immunity. *Hathaway v. Bazany*, 507 F.3d 312,

319 (5th Cir. 2007).  Because qualified immunity is an affirmative defense, the burden then shifts

to nonmovant to rebut entitlement to it. *Id.* (citation omitted).  Vitello bears the burden to show a

genuine issue of material fact exists on whether Sergeant Enriquez is entitled to qualified immunity.

Courts apply a two-step analysis to determine whether a defendant is entitled to summary

judgment on the basis of qualified immunity.  First, the court determines whether, viewing the

summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the

plaintiff's constitutional rights," and, "[i]f so, the court next considers whether the defendant's actions

were objectively unreasonable in light of clearly established law at the time of the conduct in

question. *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007).  The court applies an objective

standard based on the viewpoint of a reasonable official in light of the information then available ...

and the law that was clearly established at the time. *Id.* at 411.

Regarding the first step, "all claims that law enforcement officers have used excessive

force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v.

Connor*, 490 U.S. 386, 395 (1989); *Colston v. Barnhart*, 130 F.3d 96, 102 (5th Cir. 1997) ("The

Fourth Amendment's protection against unreasonable seizures of the person has been applied in

causes of action under 42 U.S.C. § 1983 to impose liability on police officers who use excessive

force against citizens.").  To state a violation of the Fourth Amendment's right to be free from

excessive force, a plaintiff must show a seizure, plus: (1) an injury (2) resulting directly and only

from the use of force that was excessive to the need; and (3) that force was objectively unreasonable.

*Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citation omitted); *Ikerd v. Blair*, 101

F.3d 430, 433-34 (5th Cir. 1996).  There is no dispute that Vitello suffered an injury.  The relevant

question in this case is whether the force was "clearly excessive" or "clearly unreasonable." *Ramirez v. Knowlton*, 542 F.3d 124 (5th Cir. 2008). The determination of that question is based on the third factor- that is, whether the use of force was objectively unreasonable?

The objective reasonableness of the amount of force used turns on the facts and the circumstances for each incident. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004). In gauging objective unreasonableness, this court balances the nature and intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998). "To gauge the objective reasonableness of the force used by a law enforcement officer, [the court] must balance the amount of force used against the need for force," paying "careful attention to the facts and circumstances of each particular case." *Flores*, 381 F.3d at 399 (internal quotation marks and citations omitted).

In *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), the Supreme Court explained that where the suspect poses no immediate threat to the officer or to others, the harm resulting from the failure to apprehend him does not justify the use of deadly force. The Court also explained that, where the officer has probable cause to believe that the suspect does pose a threat of serious bodily injury to the officer or to others, then it is not constitutionally unreasonable to prevent escape with deadly force. *Id.* Deadly force, a subset of excessive force, violates the Fourth Amendment unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Bazan v. Hidalgo County*, 246 F.3d 481, 487-88 (5th Cir. 2001) (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This is an objective standard: "the

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This test "allow[s] for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.* The test for reasonableness also must consider "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

The issue is whether Sergeant Enriquez acted reasonably when he fired four shots at Vitello, who was seated in the back seat of Officer Crawford's vehicle.  In so doing, this court considers relevant Fifth Circuit case law.

In *Reese v. Anderson,* 926 F.2d 494 (5th Cir. 1991), an unarmed robbery suspect was shot and killed by a police officer. After a high-speed chase, police officers stopped the victim, Crawford, and his accomplices in their getaway car. Officer Anderson ordered the car's occupants to raise their hands.  Crawford remained in the car and repeatedly raised and lowered his hands. The third time Crawford lowered his hands, he turned slightly away from the officer and reached lower toward the floorboard. When he started to sit back up, Anderson shot him once in the head at a range of ten feet. It was later discovered that Crawford was actually unarmed.

The Fifth Circuit concluded:

> Under these circumstances, a reasonable officer could well fear for his safety and that of others nearby. He could reasonably believe that Crawford had retrieved a gun and was about to shoot. That is, an officer would have probable cause to believe that "the suspect pose[d] a threat of serious physical harm." *Garner*, 471 U.S. at 11, 105 S. Ct. at 1701. Anderson had repeatedly warned Crawford to raise his hands and was now faced with a situation in which another warning could

> (it appeared at the time) cost the life of Anderson or another officer.
> Under such circumstances, an officer is justified in using deadly force
> to defend himself and others around him.

*Reese v. Anderson*, 926 F.2d at 501.

In *Young v. City of Killeen, Tex.*, 775 F.2d 1349 (5th Cir. 1985), the Fifth Circuit considered

another use of deadly force.

> David Young, with a friend, drove to a parking lot in an area of
> Killeen where they could buy marijuana. Officer Olson observed the
> apparent drug transaction between the two men in Young's car and a
> pedestrian. Olson directed his patrol car, with lights flashing, at the
> participants in the attempt to apprehend them. The pedestrian fled on
> foot, and Young tried to drive away. Olson successfully blocked
> Young by pulling his patrol car in front of Young's car. Olson left his
> car and ordered Young and his passenger to exit theirs. Young
> apparently reached down to the seat or floorboard of his car and
> Olson, believing that Young had a gun, fired his own weapon. The
> shot was fatal.

*Young*, 775 F.2d at 1351.

The Fifth Circuit found that:

> If Young's movements gave Olson cause to believe that there was a
> threat of serious physical harm, Olson's use of deadly force was not
> a constitutional violation. *Tennessee v. Garner*, 471 U.S. at ----, 105
> S.Ct. at 1701, 85 L.Ed.2d at 9-10. The only fault found against Olson
> was his negligence in creating a situation where the danger of such a
> mistake would exist. We hold that no right is guaranteed by federal
> law that one will be free from circumstances where he will be
> endangered by the misinterpretation of his acts.

*Young*, 775 F.2d at 1353.

In *Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003), the Fifth Circuit considered the

reasonableness of an officer's use of deadly force. The Fifth Circuit summarized the facts as follows:

> On April 16, 2001, police in the City of Palestine, Texas,
> responded to complaints of a disturbance involving two intoxicated

16

individuals at a mobile home park. Officers arriving on the scene found Jacob Vincent Revill ("Revill") inside a mobile home with the door open, yelling, cursing, brandishing an eighteen to twenty inch sword and breaking windows. Blood was on his hands and on the broken windows. The officers, with weapons drawn, told Revill to drop the sword. Revill told the officers to stay away from him and threatened to kill himself. He claimed to be an expert in martial arts and made several martial arts motions with the sword in an effort to keep the officers at bay. Revill demanded to talk to Chief of Police Pat Henderson. Henderson arrived on the scene and attempted to calm Revill by talking to him. Revill remained agitated, cursing his father and his girlfriend, and continued yelling and brandishing the sword. Henderson told Revill to drop the sword and not to advance on the officers. He offered to take Revill to see a doctor or psychologist. While Henderson was talking to him, Revill exited the mobile home. Revill continued to brandish and make punching motions with the sword. During this time Revill was between eight and ten feet away from the officers. When Revill turned, and raised the sword toward the officers, Henderson shot Revill in his right arm, causing him to drop the sword. . . . Revill died at the hospital.

*Id.* at 622-23.

The Fifth Circuit concluded:

Henderson was faced with an intoxicated, violent and uncooperative individual who was wielding a sword within eight to ten feet of several officers in a relatively confined space. It is not objectively unreasonable for an officer in that situation to believe that there was a serious danger to himself and the other officers present. Although, in retrospect, there may have been alternative courses of action for Henderson to take, we will not use "the 20-20 vision of hindsight" to judge the reasonableness of Henderson's use of force. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Henderson's use of force against Revill was not objectively unreasonable; therefore, it was not in violation of the Constitution. Because Henderson did not violate Revill's constitutional right to be free from excessive force, he is entitled to qualified immunity from suit on Mace's excessive force claim. . .

*Mace v. City of Palestine*, 333 F.3d at 625.

In *Hudspeth v. City of Shreveport,* 2008 WL 749547 (5th Cir. 2008), an unpublished opinion, the Fifth Circuit found that in light of the videotape evidence, the Officers' actions were objectively reasonable. The videotape showed that Hudspeth pointed a cell phone in the Officers' direction, resisted interaction with them, tussled with Officer Ramsey, turned suddenly toward the Officers, and attempted to flee. Because the officers had an articulable basis to believe Hudspeth was armed and could reasonably have perceived him as posing a threat of serious bodily harm, the Fifth Circuit concluded that no genuine issue of material fact existed and that their actions were objectively reasonable.

Applying the Fourth Amendment's objective reasonableness standard, this court must determine the reasonableness of Sergeant Enriquez's use of deadly force in the light of the facts and circumstances confronting him at the time he acted, without regard to his underlying intent or motivation. *Graham*, 490 U.S. at 396, 109 S. Ct. 1865.  In making this determination, this court recognizes that police officers such as Sergeant Enriquez are "forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In his affidavit, Sergeant Enriquez testified that on September 12, 2002, he met with other DPS and HPD officers for the initial briefing on the buy/bust operation.  (Docket Entry No. 54, Defendant Enriquez's Motion for Summary Judgment, Ex. B, pp. 2-4).  Sergeant Enriquez was parked in the mall parking lot where he was able to see Officer Crawford's vehicle.  From the briefing, Sergeant Enriquez understood that Officer Crawford was only supposed to be meeting with one suspect. Sergeant Enriquez observed the first suspect, Daniel Polk, approach the vehicle on foot and get into the front passenger seat of Officer Crawford's vehicle. Sergeant Enriquez watched Officer Crawford drive his vehicle around the parking lot and eventually re-park near his original

location. Sergeant Enriquez saw a second suspect, Michael Vitello, approach the vehicle on foot. Vitello, carrying a backpack, entered Officer Crawford's vehicle from the rear door on the driver's side.   Sergeant Enriquez became concerned because he had previously been told that there would only be one suspect involved in the operation. From training and experience, Sergeant Enriquez knew that having an additional suspect in the vehicle positioned behind Officer Crawford posed a greater risk to Crawford's safety.   Soon after Vitello entered Officer Crawford's vehicle, Officer Nelius, who was monitoring the listening device, advised the back up officers that the suspects were attempting to rob Officer Crawford.  Sergeant Enriquez feared for Officer Crawford's life. Sergeant Enriquez immediately drove his vehicle toward Officer Crawford's vehicle and parked his vehicle so that it was facing Officer Crawford's vehicle.  As Sergeant Enriquez drove toward Officer Crawford's vehicle, he could see Polk standing inside the open passenger door, leaning into Officer Crawford's vehicle and pointing a handgun toward Officer Crawford. Sergeant Enriquez got out of his vehicle and moved quickly toward the passenger side of Officer Crawford's vehicle, where Polk was standing. As he approached Polk, Sergeant Enriquez noticed he had a gun in his hand and it appeared to be pointed in the direction of Officer Crawford. Sergeant Enriquez identified himself as "POLICE" to Polk and told him to drop the gun. Polk looked at Sergeant Enriquez and ran away from him toward the back of Officer Crawford's vehicle.  Sergeant Enriquez then heard a gunshot and saw Polk go down from his peripheral vision. Polk was shot by a nearby officer.  Immediately afterward, Sergeant Enriquez heard a gunshot and saw a muzzle blast from inside Officer Crawford's vehicle, heard a yell, and saw Officer Crawford slump to his left.  Sergeant Enriquez immediately believed that the suspect in the backseat, Vitello, had shot Officer Crawford. Sergeant Enriquez fired a shot through the front passenger window toward the backseat area because Sergeant Enriquez

feared for the lives of all officers in the area, including Officer Crawford and himself. Sergeant Enriquez could not see clearly into Officer Crawford's vehicle because of the dark window tinting. Sergeant Enriquez could see the silhouette of a person in the backseat. Sergeant Enriquez immediately took a few steps toward the rear door in an attempt to direct Vitello's focus onto himself and off of Officer Crawford and fired three shots through the rear passenger window, into the back seat. Sergeant Enriquez then stopped firing to see if Vitello was still moving. When he saw no more movement, Sergeant Enriquez approached the vehicle and saw that Vitello had been hit.

Sergeant Enriquez's use of deadly force was not unreasonable because he had reason to believe that Vitello posed a threat of serious harm to himself and others. *Tennessee v. Garner*, 471 U.S. 1 (1985). The entirety of Sergeant Enriquez's actions were predicated on responding to a serious threat quickly and decisively. That his decision is now subject to second-guessing-even legitimate second-guessing-does not make his actions objectively unreasonable given the particular circumstances of the shooting. *See Stroik v. Ponseti*, 35 F.3d 155, 158-59 (5th Cir. 1994) ("'[W]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.'" (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992))).

The question is not whether Sergeant Enriquez failed to consider the use of non-lethal force. "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to

pursue it." *Id.* at 687.   Even if Sergeant Enriquez had acted negligently and contrary to police

procedure, the Fifth Circuit has failed to recognize a constitutional claim where a police officer used

deadly force in response to a reasonable belief that an individual posed a threat of serious harm. *See*

*Young v. City of Killeen*, 775 F.2d 1349, 1350-53 (5th Cir. 1985).   The Fourth Circuit has stated this

well:

> The Fourth Amendment does not require police officers to wait until
> a suspect shoots to confirm that a serious threat of harm exists. The
> court's comment that the officers could have moved away from the
> car is, unfortunately, a suggestion more reflective of the "peace of a
> judge's chambers" than of a dangerous and threatening situation on
> the street.

*Ramirez v. Knowlton*, 542 F.3d 130 (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)).

Because Sergeant Enriquez's actions were objectively reasonable, this court concludes that

he did not violate Vitello's Fourth Amendment rights. *Hathaway v. Bazany,* 507 F.3d 312, 322 (5th

Cir. 2007).   Sergeant Enriquez knew of the inherent dangers associated with an undercover buy-bust

operation.   He knew that the risk to Officer Crawford's safety increased when two people became

involved, instead of a single person as originally planned.   Sergeant Enriquez could see that Polk was

in the front passenger seat of Crawford's vehicle.   Sergeant Enriquez saw Vitello get into Officer

Crawford's vehicle behind the driver's seat.   When he learned that the two suspects were trying to

rob Officer Crawford, Sergeant Enriquez took swift action. He saw Polk pointing a gun at Crawford.

Sergeant Enriquez saw Polk drop the gun on the front passenger seat.   Sergeant Enriquez knew that

Vitello was still in the back seat.   When Sergeant Enriquez saw the muzzle blast from Officer

Crawford's vehicle, Sergeant Enriquez did not know who had been shot.   Sergeant Enriquez

reasonably believed that Vitello had shot Officer Crawford.   Sergeant Enriquez rushed over to

Officer Crawford's vehicle to stop Vitello from further injuring Officer Crawford or any of the other officers on the scene.   Sergeant Enriquez could see the silhouette of Vitello in the back seat. Sergeant Enriquez could not see if Vitello had a gun. He could reasonably presume, based on the muzzle blast seconds before, that Vitello was still holding a gun.  Sergeant Enriquez did not know if Vitello was about to shoot at Officer Crawford who was only a few feet from Vitello in the front of the vehicle. Sergeant Enriquez did not know if Vitello was preparing to shoot Sergeant Enriquez himself, who was standing outside Crawford's vehicle, a few feet from Vitello. Sergeant Enriquez fired four shots to protect his own life, Crawford's life, and the lives of other officers on the scene. It is not objectively unreasonable for an officer in that situation to believe that there was a serious danger to himself and the other officers present in the mall parking lot.  Although, in retrospect, there may have been alternative courses of action for Sergeant Enriquez to take, this court will not use "the 20-20 vision of hindsight" to judge the reasonableness of Sergeant Enriquez's use of force. *Graham*, 490 U.S. at 396.  Sergeant Enriquez's use of force against Vitello was not objectively unreasonable; therefore, it was not in violation of the Constitution. Because Sergeant Enriquez did not violate Vitello's constitutional right to be free from excessive force, he is entitled to qualified immunity from suit on Vitello's excessive force claim.

This court must consider the reasonable belief of the officer at the scene. The issue before the court is whether, in considering the totality of the circumstances, Sergeant Enriquez had "probable cause to believe that the suspect pose[d] a threat of serious physical harm." *Garner*, 471 U.S. at 11. This court concludes that he did.  Sergeant Enriquez was forced to make a split-second judgment about the amount of force that was necessary in a particular situation. He was acting under circumstances that were tense, uncertain, and rapidly evolving. "Even law enforcement officials who

'reasonably but mistakenly' [use excessive force] are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  This court finds that the record on Sergeant Enriquez's involvement supports a ruling for Sergeant Enriquez on his motion for summary judgment on Vitello's excessive use of force claim.  Police officers who reasonably but mistakenly conclude that deadly force is needed to protect themselves and their fellow officers are entitled to qualified immunity for using that force. *See id.*  Upon seeing the muzzle blast, Sergeant Enriquez could reasonably have believed that Crawford had been shot by the occupant of the back seat, Vitello.  Although mistaken, Sergeant Enriquez's belief was reasonable.  Sergeant Enriquez was in the parking lot watching Crawford's vehicle at the time he saw the muzzle blast. Sergeant Enriquez had no way of knowing that Vitello had actually been shot by Officer Crawford. The summary judgment evidence reasonably supports the conclusion of Sergeant Enriquez that Crawford had been shot by the occupant of the back seat.  Accordingly, the court concludes that Sergeant Enriquez is entitled to summary judgment on Vitello's claims for excessive use of force. *See Malley v. Briggs*, 475 U.S. 335 (1986).  Vitello's contentions to the contrary are unavailing. That Vitello was sitting in the back seat unarmed when deadly force was used is irrelevant. *See Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991).  In *Reese,* the Fifth Circuit stated, "Also irrelevant is the fact that Crawford was actually unarmed. [The officer] did not and could not have known this. The sad truth is that Crawford's actions alone could cause a reasonable officer to fear imminent and serious physical harm." *Id.*  Similarly, Sergeant Enriquez did not and could not have known that Vitello was unarmed. *See  Brosseau*, 543 U.S. at 196; *see also Bazan v.  Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001) (explaining the events leading up to the moment excessive force is used are relevant, as they "set the stage for what followed").

Vitello admitted in his deposition that Sergeant Enriquez was reasonable to assume that the suspects had a gun. (Docket Entry No. 54, Defendant Enriquez's Motion for Summary Judgment, Ex. E, p. 87, L. 13-17).  He also admitted that it was reasonable for Enriquez to think that Crawford had been shot, (Ex. E, p. 88, L. 18-21), and reasonable to believe that Vitello had a gun in the back seat (Ex. E, p. 89, L. 3-11).  Vitello understands why Enriquez fired his weapon in this situation. (Ex. E, p. 89, L. 12-14).  Vitello agrees that it was a dangerous situation that happened so fast, people misunderstood what was happening and that the shooting was basically an accident. (Ex. E, p. 90, L. 9-13; p. 92, L. 1-3).  Moreover, Vitello admitted that he has no evidence to refute that Sergeant Enriquez shot Vitello to save Crawford and Enriquez's lives. (Ex. E, p. 89, L. 23-25,  p. 90, L. 1-3).

Captain Radney evaluated relevant documents and gave his expert opinion as to the reasonableness of Sergeant Enriquez's conduct on September 12, 2002.  (Docket Entry No. 54, Defendant Enriquez's Motion for Summary Judgment, Ex. D, pp. 4-5).  He explained that Sergeant Enriquez knew of the inherent danger associated with a "rip-off" situation. Sergeant Enriquez acted reasonably when he approached the undercover vehicle. Enriquez reasonably believed that a "rip-off" was occurring and reasonably believed that the life of officer Crawford was in immediate danger. Sergeant Enriquez's use of deadly force was reasonable because he saw Polk holding a weapon aimed toward Officer Crawford and he saw an additional unknown suspect in the back seat of Officer Crawford's vehicle.  Because Enriquez had been told that it was a rip, it was reasonable for him to conclude that the suspects had weapons. Captain Radney further testified that when Sergeant Enriquez witnessed a muzzle blast inside Crawford's car and saw Officer Crawford fall to the side, it was reasonable for him to conclude that Officer Crawford had been shot and reasonable to

24

conclude that Vitello had a weapon and that Vitello posed an immediate threat to Officer Crawford and other officers in the area.

Because this court finds the use of force was objectively reasonable and that there was no constitutional violation, this court does not need to address the second prong of the qualified immunity analysis. *Hathaway v. Bazany*, 507 F.3d 312, 3320 (5th Cir. 2007); *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003).

Sergeant Enriquez is entitled to judgment as a matter of law on this claim.

## IV.    State Law Claims

Vitello asserts a claim for assault.   In response, Sergeant Enriquez argues that he is entitled to official immunity from liability. (Docket Entry No. 54, Defendant Enriquez's Motion for Summary Judgment, p. 19).

In Texas, "[g]overnment employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). As an affirmative defense, all three elements must be established by the party asserting it. *Id.* The good faith test is substantially the same as the standard for qualified immunity in Section 1983 cases. *Id.* at 656. If any reasonably prudent officer in the defendant's position could have thought that the circumstances justified defendant's acts, the defendant is entitled to official immunity. *Id.* at 657. The test is one of "objective legal reasonableness, without regard to the officer's subjective state of mind." *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997).   Unlike qualified immunity, whether the right was "clearly established" is immaterial. *Shaboon v. Duncan*, 252 F.3d 722, 729 (5th Cir. 2001).

Sergeant Enriquez claims that he is entitled to official immunity on Vitello's claims arising under state law. This court agrees. As outlined in the section on qualified immunity, the court has found that Sergeant Enriquez's use of force was reasonable. The same fact issues are present in the state law claim of assault. Sergeant Enriquez's actions were discretionary; he was acting within the scope of his authority when he was involved in the undercover drug operation, and he acted in good faith. As to this affirmative defense, all of its elements have been established as a matter of law. *Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002). Sergeant Enriquez's motion for summary judgment as to the state law claims is granted.

## V.    Conclusion

The motion for summary judgment filed by Officer Enriquez, (Docket Entry No. 54), is GRANTED. Vitello's claims against Officer Enriquez are DISMISSED with prejudice. Any remaining pending motions are denied as moot. Officer Crawford did not move for summary judgment on the issue of qualified immunity as to Vitello's allegations of excessive force. (Docket Entry No. 35, Officer Crawford's Motion for Partial Summary Judgment, p. 3). Vitello's claims against Officer Crawford are RETAINED for further proceedings. Vitello's state law claim of assault against Officer Crawford is RETAINED for further proceedings.

SIGNED at Houston, Texas, on March 30, 2009.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE